UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FIFTY-SIX HOPE ROAD MUSIC LTD.,         :
CEDELLA MARLEY, DAVID MARLEY,           :
JULIAN MARLEY, KAREN MARLEY,            :
RITA MARLEY, ROHAN MARLEY,              :
STEPHEN MARLEY, DAMIAN MARLEY,          :    08 CIV. 6143 (DLC)
STEPHANIE MARLEY, and ROBERT MARLEY,    :
                      Plaintiffs,       :    OPINION & ORDER
                                        :
              -v-                       :
                                        :
UMG RECORDINGS, INC.,                   :
                      Defendant.        :
                                        :
----------------------------------------X
APPEARANCES:

For Plaintiffs:

L. Peter Parcher
Elizabeth K. Murray
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036

Barry E. Mallen
Manatt, Phelps & Phillips LLP
1355 W. Olympic Blvd.
Los Angeles, CA 90064

Peter S. Shukat
Dorothy M. Weber
Shukat, Arrow, Hafer, Weber & Herbsman LLP
111 West 57th Street, Suite 1120
New York, NY 10019

For Defendant:

Andrew H. Bart
Carletta F. Higginson
Joseph J. McFadden
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, New York 10022

DENISE COTE, District Judge:

This dispute concerns the ownership of the renewal term copyrights in certain pre-1978 sound recordings embodying the performances of Jamaican reggae artist, Bob Marley (the "Sound Recordings").  The Sound Recordings were created pursuant to exclusive recording agreements between Bob Marley and the predecessor-in-interest to defendant UMG Recordings, Inc. ("UMG").  The plaintiffs -- Bob Marley's widow, Rita Marley, as well as nine of Bob Marley's children (together with Rita Marley, the "Adult Beneficiaries"), and their wholly-owned company, Fifty-Six Hope Road (collectively, the "Plaintiffs") -- allege that the renewal term copyrights in the Sound Recordings reverted to them under the Copyright Act of 1909 upon Bob Marley's death in 1981.  Plaintiffs also assert claims for underpayment of royalties against UMG.  Plaintiffs and UMG have cross-moved for partial summary judgment.  For the following reasons, UMG's motion is granted in part and Plaintiffs' motion is denied.

## BACKGROUND

1.   The Marley Recording Agreements

Bob Marley was a renowned Jamaican reggae singer and songwriter who, from August 25, 1972, until his death in 1981, rendered services as a recording artist to Island Records Ltd.

and Island Records, Inc. (together "Island") pursuant to a
series of exclusive recording agreements.  Defendant UMG is
Island's successor-in-interest.[1]  UMG is the largest record
company in the world and is engaged in the business of producing
sound recordings, and distributing, selling, and licensing the
distribution and sale of its sound recordings as phonorecords.
Among its activities, UMG sells, licenses, and distributes sound
recordings embodying the performances of Bob Marley, including
the Sound Recordings that are the subject of Plaintiffs'
copyright claim in this action.

    a.   The 1972 Agreement:  "Catch A Fire" and "Burnin'"

    On August 25, 1972, Island entered into a recording
agreement with Bob Marley and two other artists (the "1972
Agreement").[2]  Pursuant to the 1972 Agreement, Marley agreed to
perform services as a recording artist exclusively for Island
and to produce "sufficient acceptable recordings" for two albums
during the term of the agreement.  Island agreed to pay Bob

---

[1] In the late 1980s or early 1990s, Island was acquired by an
entity within the PolyGram Music Group ("PolyGram").  In 1998,
Universal Music Group, of which UMG is a part, acquired
PolyGram.

[2] The 1972 Agreement consists of a customized letter agreement,
attached to which are certain standard recording artist contract
conditions.  The 1972 Agreement states that in the event of a
conflict between the provisions of the letter and those of the
conditions, the provisions of the letter shall govern.  The 1974
and 1975 Agreements, discussed below, have the same format.

Marley certain advances against royalties for the creation of the Sound Recordings.  Island also agreed to permit Marley to use Island's studios to record his performances, subject to the right to recover the costs of these recording sessions from royalties.[3]

The 1972 Agreement provided that Island had the right to compel Bob Marley's attendance at various locations for the purpose of recording his performances.  The 1972 Agreement states in pertinent part:

> The Artist shall during the period attend at such places and times as the Company shall reasonably require and shall render to the best of his skill and ability and to the satisfaction of the Company such performances . . . as the Company shall elect for the purpose of reproduction in or by any record or sound recording.

The 1972 Agreement further provided that Island and Bob Marley would "[m]utually agree" as to the lyrics and music to be recorded, but that Island could "[d]ecide in its discretion whether or not such lyrics and music as recorded are acceptable and satisfactory for the manufacture and sale of records."

The 1972 Agreement stated that "all recordings featuring the Artist and recorded by the Company . . . in pursuance hereof are the absolute property of the Company and the Company will continue to account to the Artist for the royalties thereon both

---

[3] An invoice attached to the 1972 Agreement shows that Island also advanced certain recording costs to Bob Marley, at least some of which appear to have been recouped from royalties.

4

during the period and thereafter."  Under the 1972 Agreement, Island was "entitled to the sole and exclusive right in perpetuity throughout the territory of production reproduction sale and distribution . . . and performance (including broadcasting) throughout the Territory by any and every means whatsoever of recordings incorporating the Artist's performances."[4]

Island released two albums pursuant to the 1972 Agreement: "Catch a Fire" and "Burnin'."  Island registered both works with the United States Copyright Office, listing "Island Records, Ltd." as the author of the sound recordings on the albums.  The 1972 Agreement contained an incontestability clause that provided that royalty statements rendered by Island were binding "unless specific objection in writing stating the basis thereof is given to the Company within twelve months from the date the statement in question is rendered."

b.   The 1974 Agreement: "Natty Dread"

On August 27, 1974, Island Records, Ltd. entered into a new recording agreement with Bob Marley and two other artists (the "1974 Agreement").  Pursuant to the 1974 Agreement, Bob Marley agreed that he would provide his services exclusively to Island

---

[4] The 1972 Agreement defined "Territory" as the world excluding the "West Indies," i.e., the Caribbean.

during the term of the agreement and would produce "sufficient acceptable recordings" for two albums.  Like the 1972 Agreement, Island agreed to pay Bob Marley certain advances against royalties for the creation of the Sound Recordings.  The 1974 Agreement further provided that Island would pay advances for the recording costs of the albums "upon submission of duly verified invoices," which could only be recouped from royalties. Recording costs incurred by Island in its own studios could not be recouped.

Like the 1972 Agreement, the 1974 Agreement granted Island the right to compel Bob Marley's attendance at various locations and required Bob Marley to render such performances as Island elected for the purpose of producing the sound recordings.  The 1974 Agreement also provided that Island and Bob Marley would "[m]utually agree" as to the lyrics and music to be recorded, but that Island could "[d]ecide in its discretion whether or not such lyrics and music as recorded are acceptable and satisfactory for the manufacture and sale of records."

Under the 1974 Agreement, Island could refuse to accept an album if it determined "that such album does not have sufficient commercial potential."  In the event Island refused to accept such an album, the album would "not count towards the number of albums to be recorded" under the agreement.  Bob Marley had the right, however, subject to his first repaying Island the

recording costs for the rejected album, to release such album through a third party.

The 1974 Agreement provided that any recordings produced pursuant to the agreement were "the absolute property" of Island and that Island would have the exclusive and perpetual right to exploit such recordings by "any and every means whatsoever" throughout the Territory.

Island released one album pursuant to the 1974 Agreement: "Natty Dread."  It registered the album with the United States Copyright Office, listing "Island Records Ltd." as the author of the sound recordings on the album.  Like the 1972 Agreement, the 1974 Agreement contained an incontestability clause which required that any objections to a royalty statement be made in writing, but extended the time period for such objections to three years after the date the statement is rendered.


c.   The 1975 Agreement: "Rastaman Vibrations" and "Exodus"

On August 6, 1975, Island Records, Inc. entered into an agreement (the "1975 Agreement") with Media Aides Limited ("Media Aides"), a company owned and controlled by Bob Marley. The 1975 Agreement included a personal inducement letter from Bob Marley stating that he had licensed his exclusive services to Media Aides, that Media Aides was authorized to furnish his personal services to Island, and that he would personally

perform under the contract if Media Aides was not able.  Despite being denominated a "License," the 1975 Agreement contained almost identical exclusivity, control, ownership, and payment provisions as the 1972 and 1974 Agreements.

Pursuant to the 1975 Agreement, Media Aides agreed to deliver to Island "satisfactorily recorded sufficient acceptable material" to comprise at least six albums.  The 1975 Agreement provided that Island would pay Media Aides certain advances for the creation of the Sound Recordings, which could be recouped from royalties.  In addition, the 1975 Agreement provided that "the Company shall pay, as additional advance royalties, an amount equal to the cost of recording each album" up to a maximum of $35,000 for each album.  Advances for recording costs were recoupable only from royalties.

Unlike the 1972 and 1974 Agreements, the 1975 Agreement provided Media Aides the right to "determine the times and places for recording."  Other provisions stated, however, that "the times of recordings shall be such that albums are delivered at reasonable intervals" and that Bob Marley "shall render to the best of [his] skill and ability and to the satisfaction of [Island] such performances . . . as [Island] shall elect for the purpose of reproduction in or by any record or sound recording." Furthermore, Media Aides could not "deliver more than two (2) albums during [each] calendar year period" and could not

"manufacture, distribute or sell or authorize . . . phonograph records" featuring Bob Marley performances for three months following delivery of the last album.

The 1975 Agreement provided that Island and Media Aides would "[m]utually agree" as to the lyrics and music to be recorded, but reserved to Island the right to "[d]ecide in its discretion whether or not such lyrics and music as recorded are acceptable and satisfactory for the manufacture and sale of records."  As under the 1974 Agreement, Island could also reject an album under the 1975 Agreement if it decided "that such album does not have sufficient commercial potential" to be released. In the event Island refused to accept an album, the album would "not count towards the number of albums to be delivered" under the agreement, and Media Aides had the right, subject to it first repaying Island the recording costs for the rejected album, to release such album through a third party.

Pursuant to the 1975 Agreement, Media Aides agreed that Island had the exclusive right in perpetuity to exploit the Sound Recordings.  The 1975 Agreement states in pertinent part:

> [Media Aides] hereby licenses in perpetuity to
> [Island] all present and future record and recording
> copyright and [Island] shall be entitled to the sole
> and entire copyright in recordings made by the Artist
> during the period including . . . the exclusive right
> in perpetuity throughout the territory of production
> reproduction sale and distribution . . . and
> performance throughout the Territory by any and every

means whatsoever of all such recordings.
The 1975 Agreement further provided that sound recordings
produced pursuant to the agreement were "the absolute property"
of Island.

Prior to 1978, Island released two albums pursuant to the
1975 Agreement:  "Rastaman Vibrations" and "Exodus."[5]  Island
registered both albums with the United States Copyright Office,
listing "Island Records Ltd." as the author of the sound
recordings on the albums.  The 1975 Agreement contained an
incontestability clause which required any objections to a
royalty statement be made in writing within three years after
the statement is rendered.  The 1975 Agreement states that it is
to be governed by California law.

d.  Agreements after Marley's Death

Bob Marley died intestate on May 11, 1981.  Rita Marley,
Bob Marley's widow, was appointed one of three administrators of
Bob Marley's estate (the "Estate"), and acted on behalf of Media
Aides until sometime in late 1986.  During this time, Media
Aides entered into new agreements with Island in 1983, 1984, and
1986 governing the creation of additional albums --

---

[5] Additional albums containing sound recordings produced pursuant
to the 1975 Agreement were subsequently released.  The sound
recordings on such albums are not the subject of Plaintiffs'
copyright claim in this action.

"Confrontation," "Legend," and "Rebel Music," respectively --
containing sound recordings embodying the performances of Bob
Marley (together with the 1972, 1974, and 1975 Agreements, the
"Marley Recording Agreements").  Like the 1974 and 1975
Agreements, the 1983 Agreement contains a three-year
incontestability clause for royalty statements rendered by
Island, which is incorporated by reference into the 1984
Agreement.[6]

2.    The 1992 Royalties Agreement

      In 1988, certain Estate assets, including all of the
Estate's rights and obligations under the Marley Recording
Agreements, were transferred to Island Logic, Inc., a company
controlled by Chris Blackwell ("Blackwell"), a founder and
former executive of Island.  On December 19, 1989, the Estate
assets were transferred to another company controlled by
Blackwell, Island Logic Ltd. (together with Island Logic, Inc.,
"Island Logic").  On March 3, 1990, the Estate assets were again
transferred to a Dutch foundation called the Stitching Bob

---

[6] While the 1986 Agreement states that royalties for the sound
recordings on "Rebel Music" "shall be calculated and computed on
the same basis mutatis mutandis" as provided in the 1984
Agreement, the 1986 Agreement does not expressly incorporate the
incontestability clause of the 1983 Agreement -- either directly
by reference to the 1983 Agreement itself, or indirectly by
reference to the provision of the 1984 Agreement incorporating
the 1983 Agreement's incontestability clause.

Marley (the "Stitching"), which was created by Blackwell, apparently for tax purposes.

In the summer of 1993, Island and the Stitching entered into an agreement dated with effect from July 1, 1992 (the "1992 Royalties Agreement").  The 1992 Royalties Agreement concerned, inter alia, the royalty rates and methods of royalty calculations for the sound recordings produced pursuant to the Marley Recording Agreements.  Paragraph 2(c) of the 1992 Royalties Agreement provided in pertinent part that:

> the royalty rates and methods of royalty calculations for records released in formats newly developed as a result of advanced technology (including, without limitation, digital compact cassette), same shall be determined on the average, from time to time, as utilized in computing royalties for the format concerned with respect to the then top ten (10) selling "popular" recording artists whose vocal performances are in the English language and whose agreement in respect of their recording services is with [PolyGram].

Attached to the 1992 Royalties Agreement was a "Royalty Schedule."  Paragraph 11 of the Royalty Schedule provided:

> In the event that Island sells or licenses third parties to exploit Masters via telephone satellite cable or other direct transmission to the consumer over wire or through the air, Island will credit to your royalty account sixty percent (60%) of its receipts therefrom attributable to the Masters or any of them.

The Royalty Schedule defines the term "Masters" as "master recordings."

3.   Transfer of Estate Assets to Fifty-Six Hope Road

Fifty-Six Hope Road, whose sole shareholders are the Adult Beneficiaries, was founded on June 23, 1995.  On August 9, 1995, the Adult Beneficiaries, Fifty-Six Hope Road, and Island Logic entered into a series of contracts that transferred certain Estate assets, including the Estate's rights and obligations under the Marley Recording Agreements, from Island Logic to Fifty-Six Hope Road.[7]

4.   Copyright Renewal Registrations

The copyrights in the Sound Recordings created pursuant to the 1972, 1974, and 1975 Agreements began to enter the renewal term in January 2002.[8]  Beginning on December 21, 2001, UMG filed renewal registrations for the Sound Recordings with the United States Copyright Office.  UMG filed a copyright renewal registration for "Catch a Fire" on December 21, 2001; for "Burnin'" on December 23, 2002; for "Natty Dread" and "Rastaman Vibrations" on December 20, 2004; and for "Exodus" on December

---

[7] The Stitching had conveyed the rights under the Marley Recording Agreements back to Island Logic on June 30, 1994, in preparation for the ultimate transfer of the Estate assets to the Adult Beneficiaries.

[8] Specifically, "Catch a Fire" and "Burnin'" entered the renewal copyright term on January 1, 2002; "Natty Dread" entered the renewal term on January 1, 2003; "Rastaman Vibrations" entered the renewal term on January 1, 2005; and "Exodus" entered the renewal term on January 1, 2006.

30, 2005.  On each of the renewals, UMG listed Island as the author and claimant of copyright for the Sound Recordings.

5.  This Litigation

On January 8, 2008, attorneys for the Plaintiffs sent a letter and "draft" audit report to UMG in which Plaintiffs claimed that UMG had underpaid royalties for the period from January 1, 2001 to June 30, 2005.[9]  The largest dollar item in the audit report concerned UMG's alleged underpayment of royalties on digital downloads.[10]  The parties were unable to resolve the royalties dispute.

On July 3, 2008, Plaintiffs filed the original complaint in this action.  The complaint principally alleged that UMG had failed to pay Fifty-Six Hope Road all of the royalties owed under the Marley Recording Agreements.  On November 20, Plaintiffs filed a first amended complaint that, like the original complaint, focused on underpayment of royalties.  On December 29, the Plaintiffs filed a second amended complaint in which the Plaintiffs asserted for the first time that they owned

---

[9] On March 31, 2010, the Plaintiffs served UMG with an updated audit report claiming underpayment of royalties for the periods January 1, 2001 to June 30, 2005, and July 1, 2005 through June 30, 2009.

[10] Plaintiffs indicate in their briefs that their royalty accounting claims concern only the sale of albums released pursuant to the Marley Recording Agreements dated 1975 and later, not those covered by the 1972 or 1974 Agreements.

the renewal term copyrights in the Sound Recordings.  Plaintiffs filed a third amended complaint on January 30, 2009.  The third amended complaint seeks a declaratory judgment that the Plaintiffs are the owners of the renewal term copyrights in the Sound Recordings, as well as damages for breach of contract based on UMG's purported failure to account properly for royalties and UMG's granting of unauthorized licenses for the certain sound recordings.  On March 4, 2009, UMG filed its answer to the third amended complaint and asserted two counterclaims against Plaintiffs for breach of contract and indemnification.[11]

On May 7, 2010, Plaintiffs and UMG filed cross-motions for partial summary judgment.  The motions were fully submitted on June 11.

---

[11] UMG's counterclaim asserts that "in the event that the Marley Heir Plaintiffs prevail in their belated attempt to reclaim these renewal rights, then Fifty-Six Hope Road will be liable to UMG for breach of the representations, warranties and contractual transfers contained in the numerous agreements between Fifty-Six Hope Road, through its predecessors, and UMG, through its predecessors."  UMG further contends that pursuant to the 1983 Agreement, Fifty-Six Hope Road must indemnify UMG for any and all liability, costs and expenses, including attorneys' fees, incurred by UMG in connection with defending against the Plaintiffs' claim that they are the owners of the renewal term copyrights in the Sound Recordings.

DISCUSSION

1.  Legal Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

2.   The Copyright Claim

    Both Plaintiffs and UMG have moved for summary judgment on Plaintiffs' claim for a declaratory judgment that they own the renewal term copyrights in the Sound Recordings.  The Plaintiffs contend that because Bob Marley died in 1981, before the copyrights in the Sound Recordings entered the renewal terms, ownership of the renewal term copyrights reverted to them under the Copyright Act of 1909 (the "1909 Act").  Because Plaintiffs have not conveyed the copyrights to UMG, or anyone else, Plaintiffs claim that they are the rightful owners of the renewal term copyrights.

    UMG vehemently disputes Plaintiffs' claim.  UMG argues that through its predecessor-in-interest, Island, UMG has at all times been the statutory "author" of the Sound Recordings.  UMG contends that the 1972, 1974, and 1975 Agreements demonstrate

17

that the Sound Recordings were "works made for hire" under the 1909 Act.  As a result, UMG contends that it owns the copyrights in the initial and renewal terms, regardless of when Bob Marley died.

An analysis of the Plaintiffs' claim must begin with the distinction between the meaning of the term "author" in its common dictionary sense and the meaning of the term "author" as a legal conclusion in copyright law.  UMG does not deny that Bob Marley is the author of the Sound Recordings in the common dictionary sense, i.e., in the sense that he is their creator or source of the Sound Recordings.  UMG disputes, however, that Bob Marley is the author of the Sound Recordings in the legal sense, i.e., in the sense that Bob Marley is the person in whom the statutory copyright in the Sound Recordings initially vested and to whose heirs the renewal term of the copyright reverted when he died before commencement of that term.

Typically, the author in the common dictionary sense is also the author for purposes of copyright law.  Here, however, UMG argues that because Island contracted with Bob Marley to author the works, paid him to do so, bore the expenses for the Sound Recordings, and had control over the final albums that were produced, it is the "author" of the Sound Recordings for purposes of copyright law.  In short, UMG claims that the Sound Recordings were "works for hire" and that it is therefore

entitled to the financial rewards copyright law traditionally
grants to encourage such efforts.

Because the Sound Recordings were recorded prior to January
1, 1978, they are governed by the 1909 Act.  <u>Martha Graham Sch.</u>
<u>and Dance Found., Inc. v. Martha Graham</u>, 380 F.3d 624, 632 (2d
Cir. 2004) ("<u>Martha Graham</u>").  For copyrights that were in their
initial term as of January 1, 1978, the initial term of
copyright protection endures until December 31 of the twenty-
eighth year from the date that the copyright was originally
secured.  17 U.S.C. § 304(a)(1)(A); § 305.  For copyrighted
"works made for hire," the employer is entitled to additional
copyright protection during the renewal term of 67 years.  <u>Id.</u>
§ 304(a)(1)(B)(ii).  For copyrighted works that were not "works
made for hire," the renewal term belongs to the author or to
"the widow, widower, or children of the author, if the author is
not living."  <u>Id.</u> § 304(a)(1)(C)(ii).

Under the 1909 Act, the word "author" includes "an employer
in the case of works made for hire."  17 U.S.C. § 26 (repealed).
"Thus, with respect to works for hire, the employer is legally
regarded as the 'author,' as distinguished from the creator of
the work."  <u>Martha Graham</u>, 380 F.3d at 634.  "If a work is a
work for hire under the 1909 Act, the employer as statutory
'author' owns the original term, and the renewal term vests in
the employer if the employer makes an application for renewal

within the last year of the original term." Id. (citing 17 U.S.C. § 24 (repealed)).

In determining whether a work is a "work made for hire" under the 1909 Act, the Second Circuit applies the "instance and expense" test. Martha Graham, 380 F.3d at 634. "The copyright belongs to the person at whose 'instance and expense' the work was created." Id. at 634-35 (citing Brattleboro Publ'g Co. v. Winmill Publ'g Corp., 369 F.2d 565, 567 (2d Cir. 1966)). The "instance and expense" test determines work-for-hire status regardless of whether the work was created by a traditional "employee" or an "independent contractor." Martha Graham, 380 F.3d at 635; see also Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 158-63 (2d Cir. 2003) ("Hogarth"); Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972).

"A work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." Martha Graham, 380 F.3d at 635; see also Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995). "The right to direct and supervise the manner in which work is created need never be exercised." Martha Graham, 380 F.3d at 635; see also Playboy, 53 F.3d at 554 ("[T]he hallmark of 'an employment for hire' is whether the employer could have

20

<u>exercised</u> the requisite power to control or supervise the creator's work." (citation omitted) (emphasis added)); <u>Picture Music</u>, 457 F.2d at 1216.  The Second Circuit has acknowledged that its jurisprudence concerning the status of commissioned works under the 1909 Act has created "an almost irrebuttable presumption that any person who paid another to create a copyrightable work was the statutory 'author' under the 'work for hire' doctrine."  <u>Hogarth</u>, 342 F.3d at 158 (citation omitted).

"Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work.  That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral."  <u>Playboy</u>, 53 F.3d at 554 (citing <u>Roth v. Pritikin</u>, 710 F.2d 934, 937 n.3 (2d Cir. 1983)).  "The burden of proof is on the independent contractor to demonstrate by a preponderance of the evidence that such a contrary agreement was reached."  <u>Playboy</u>, 53 F.3d at 554-55.

The Sound Recordings were works made for hire under the 1909 Act.[12]  The plain language of the 1972, 1974, and 1975 Agreements clearly demonstrate that the Sound Recordings were

_____

[12] Plaintiffs' copyright claim concerns only the renewal term copyrights in the Sound Recordings created before January 1, 1978, pursuant to the 1972, 1974 and 1975 Agreements.  Thus, Plaintiffs' claim does not concern sound recordings created in 1978 or later pursuant to the 1975 Agreement or subsequent agreements between Media Aides and Island.

21

created at the instance of Island and that Island had the right
to direct and supervise the manner in which Bob Marley created
the Sound Recordings.  Each of the agreements obligated Bob
Marley to produce "sufficient acceptable recordings" to comprise
a specific number of albums for Island within the term of each
agreement.  In addition, the 1972 and 1974 Agreements required
Bob Marley to

> attend at such places and times <u>as [Island] shall</u>
> <u>reasonably require</u> and shall render to the best of his
> skill and ability and <u>to the satisfaction of [Island]</u>
> such performances . . . <u>as [Island] shall elect</u> for
> the purpose of reproduction in or by any record or
> sound recording.

(Emphasis added.)  Although the 1975 Agreement granted Media
Aides the right to "determine the times and places for
recording" Bob Marley's performances, this right was
circumscribed by (1) the requirement that Bob Marley "render to
the best of [his] skill and ability and to the satisfaction of
[Island] such performances," (2) the limitation on the number of
albums that Media Aides could deliver each calendar year, and
(3) the restriction on Media Aide's right to manufacture or
distribute records of Bob Marley's performances after the
delivery of the last album.  Furthermore, while Island and Bob
Marley were to "[m]utually agree" prior to recording as to the
lyrics and music to be recorded under all three agreements,
Island had the right to "[d]ecide <u>in its discretion</u> whether or

not such lyrics and music <u>as recorded</u> are acceptable and
satisfactory for the manufacture and sale of records."
(Emphasis added.)  Likewise, under the 1974 and 1975 Agreements,
Island could refuse to accept an album if it determined that the
album did not have "sufficient commercial potential."

Island was also responsible for the expense of creating the
Sound Recordings.  The 1972, 1974, and 1975 Agreements each
provided that Island would pay Bob Marley certain advances
against royalties for the creation of the Sound Recordings.  In
addition, the 1974 and 1975 Agreements stated that Island would
advance Bob Marley the recording costs for the albums produced
pursuant to these agreements, which could only be recouped from
royalties.  While the 1972 Agreement did not explicitly provide
that Island would advance recording costs, the invoice attached
to that agreement shows that Island did in fact advance
recording costs for the albums produced pursuant to the 1972
Agreement.  The 1974 Agreement also stated that any recording
costs incurred by Island in its own studios would <u>not</u> be
recoupable.  Thus, Island bore the expense associated with the
creation of the Sound Recordings.

Because the Sound Recordings were works for hire, Island,
and its successor-in-interest, UMG, is presumed to be the
statutory author under the 1909 Act.  While this presumption can
be overcome by evidence of an agreement to the contrary, the

Plaintiffs have presented no evidence of such an agreement.  In fact, other provisions in the 1972, 1974, and 1975 Agreements reinforce the presumption that UMG is the statutory author of the Sound Recordings.  Each of the agreements provided that the Sound Recordings were the "absolute property" of Island, and that Island was entitled to the "sole and exclusive right in perpetuity" to exploit the Sound Recordings by "any and every means whatsoever."  That the Sound Recordings were works made for hire is also consistent with the original copyright registrations and renewal registrations, which listed Island, not Bob Marley, as the "author" of the Sound Recordings.[13]

Plaintiffs argue that the Sound Recordings were not works for hire because they were not traditional "commissioned" works and because Bob Marley "would have continued to record his music regardless of whether Island had agreed to a recording contract."  Plaintiffs' argument that the Sound Recordings were not traditional commissioned works elevates form over substance.  Plaintiffs ignore the reality that, but for the Marley Recording Agreements, these particular Sound Recordings would never have been produced.  Whether Marley would have recorded his music

---

[13] "A certificate of registration creates no irrebuttable presumption of copyright validity.  Extending a presumption of validity to a certificate of copyright merely orders the burdens of proof."  Hogarth, 342 F.3d at 166 (citation omitted).  Here, however, the copyright registrations for the Sound Recordings are consistent with the contractual language indicating that they were works for hire.

even if he had not entered the recording agreements with Island
is beside the point.  See Martha Graham, 380 F.3d at 640 ("Where
an artist has entered into an explicit employment agreement to
create works, works that she creates under that agreement cannot
be exempted from the work-for-hire doctrine on speculation about
what she would have accomplished if she had not been so
employed.").

Plaintiffs' reading of the 1972, 1974, and 1975 Agreements
ignores the provisions which obligated Marley to produce a
certain number of albums for Island, that gave Island the right
to accept, reject, modify, and otherwise control the creation of
the Sound Recordings, and that allowed Island to reject albums
that were not commercially viable.  While Plaintiffs point to
the clause stating that Island and Bob Marley would "mutually
agree" on lyrics and music before recordings were made, they
disregard the very next provision which gave Island the
discretion to decide "whether or not such lyrics and music as
recorded are acceptable and satisfactory."

Plaintiffs argue that despite these contractual provisions,
Bob Marley exercised artistic control over the recording
process.  Plaintiffs contend that Bob Marley selected the
recording studios, chose the musicians and songs to record, and
determined when the group recorded.  The fact that Marley may
have exercised artistic control over the recording process,

however, is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.  See Martha Graham, 380 F.3d at 635; Playboy, 53 F.3d at 554; Picture Music, 457 F.2d at 1216.

Plaintiffs also contend that Marley had "control over his own destiny" because the recording agreements permitted him to release any album that Island rejected on his own through a third-party.  This contractual right, which was subject to Bob Marley repaying Island for all the recording costs of any rejected album, is not inconsistent with a finding of a work-for-hire relationship.  See Picture Music, 457 F.2d at 1216 ("[T]he freedom to do other work, especially in an independent contractor situation," is "never conclusive.").  Indeed, the fact that Island could reject an album shows that Island had ultimate authority over the albums that were produced pursuant to the Marley Recording Agreements.  Likewise, the fact that any rejected album released by Bob Marley would not count towards the number of albums he was obligated to produce for Island further reinforces the conclusion that the Sound Recordings were works for hire.

As to the "expense" prong of the instance and expense test, Plaintiffs argue that Marley, not Island, was ultimately responsible for paying the expenses for the Sound Recordings.

Plaintiffs do not dispute, however, that Island paid Bob Marley advances against royalties for the creation of the Sound Recordings, or that Island advanced the recording costs for the albums.  While it is true that "where the creator of a work receives royalties as payment, that method of payment weighs against finding a work-for-hire relationship," Playboy, 53 F.3d at 555; see also Martha Graham, 380 F.3d at 641, "[t]he absence of a fixed salary . . . is never conclusive." Picture Music, 457 F.2d at 1216.  Thus, the Second Circuit held in Picture Music that a song constituted a work for hire where the creator, an independent contractor, was paid only a share of the royalties for her services in rearranging and adding lyrics to the song.  See id. at 1217.  The fact that Island paid Bob Marley advances against royalties for the creation of the Sound Recordings, combined with the fact that Island advanced the recording costs for the albums that would only be recouped if the albums were successful, is sufficient to satisfy the expense prong of the instance and expense test.

Plaintiffs point to a single provision in the 1972 Agreement that they claim required Bob Marley to "indemnify" Island for all recording costs for the Sound Recordings.  The provision states in pertinent part:  "The Artist undertakes with [Island] that all recordings made by the Artist hereunder shall be free from and the Artist will indemnify [Island] against and

27

satisfy . . . all payments in respect of all recording costs in connection therewith." Based on this provision, Plaintiffs argue that in the event the albums were unsuccessful, Island would have had "direct redress against Marley for any recording costs it had advanced." This provision, however, appears to apply only to costs that Bob Marley incurred on Island's behalf without Island's knowledge. The plain language of this provision protects Island against any unknown liabilities that might encumber its interests in the Sound Recordings. Thus, the provision also states that Bob Marley would "satisfy all payments and royalties which may . . . become due to all persons and organizations . . . whose performances or services are embodied in such sound recordings." Plaintiffs have introduced no evidence that any such hidden costs were ever incurred, or that Bob Marley ever paid Island for any such costs.[14]

Plaintiffs also argue that the recording agreements do not use the exact phrase "work made for hire," but rather contain

_____

[14] Plaintiffs also point to a provision that appears in the standard conditions attached to the 1974 and 1975 Agreements that provided that Bob Marley and Media Aides "shall pay for all costs of recordings made pursuant to this agreement and shall indemnify [Island] in respect thereof." This provision, however, conflicts with provisions in the letter portions of the 1974 and 1975 Agreements that provided that recording costs would be advanced by Island and recouped only from royalties. As noted above, both the 1974 and 1975 Agreements provide that where a conflict exists between the provisions of the letter and those in the attached conditions, the provisions of the letter govern.

language that either "assigns" or "licenses" rights from Marley

to Island for the distribution of the Sound Recordings.  The use

of the phrase "work made for hire" in an agreement is not

necessary in order to find the existence of a work-for-hire

relationship under the 1909 Act.[15]  Indeed, the Second Circuit

has held that a work was "made for hire" under the 1909 Act

despite the absence of such magic words in the contract.  <u>E.g.</u>,

<u>Martha Graham</u>, 380 F.3d at 639-41; <u>Hogarth</u>, 342 F.3d at 151-53,

163.

Faced with the clear contractual language demonstrating

that the Sound Recordings were works made for hire, Plaintiffs

attempt to introduce extrinsic evidence to support their

argument that neither Island nor Bob Marley intended for the

Sound Recordings to be works for hire.  Specifically, Plaintiffs

offer the declarations of Blackwell and Tom Hayes ("Hayes"),

former senior executives of Island, and Raphael Tisdale

("Tisdale"), an attorney who represented Bob Marley in

---

[15] By contrast, the 1976 Act defines a "work made for hire" in
pertinent part as:

> (1) a work prepared by an employee within the scope of
> his or her employment; or

> (2) a work specially ordered or commissioned . . . if
> the parties <u>expressly agree in a written instrument
> signed by them that the work shall be considered a
> work made for hire</u>.

17 U.S.C. § 101 (emphasis added).

connection with the negotiation of the 1974 Agreement.[16]
Blackwell, Hayes, and Tisdale assert that Island never intended
for the Sound Recordings to be works made for hire, but they
fail to identify any language in the agreements to support this
conclusory assertion.[17]  Moreover, Blackwell, Hayes, and Tisdale
do not dispute that Island had the contractual <u>right</u> to accept,
reject, modify, and otherwise control the creation of the Sound
Recordings, even if that right was not exercised.  Nor do they
dispute that Island paid Marley advances for the creation of the
Sound Recordings, including advances for recording costs, which
could only be recouped from royalties.  Thus, even if it were
admissible, such extrinsic evidence based on post hoc conclusory
assertions of the intent of the parties would not alter the
conclusion that the Sound Recordings were works made for hire.[18]

---

[16] On June 25, 2010, UMG moved to strike the declarations of
Blackwell, Hayes, and Tisdale because Plaintiffs did not
disclose these witnesses until after the close of discovery in
violation of Fed. R. Civ. P. 26(a).  Because the admission of
these declarations would not alter the outcome reached in this
Opinion, UMG's motion to strike is denied as moot.

[17] Hayes interprets the 1972, 1974, and 1975 Agreements as having
"provided Island a license to distribute the Marley sound
recordings covered by the agreements for the world, excluding
the Caribbean."  This interpretation, however, is at direct odds
with other provisions of the contracts, particularly those that
state that the Sound Recordings were to be the "absolute
property" of Island and that Island would have the "perpetual
right" to exploit the Sound Recordings.

[18] The Plaintiffs and UMG dispute whether the Marley Recording
Agreements should be interpreted according to New York or
California law (the only two possibilities considered by the

The 1972, 1974, and 1975 Agreements demonstrate that the Sound Recordings were produced at the instance and expense of Island, and were therefore works made for hire under the 1909 Act.  Furthermore, Plaintiffs have failed to introduce any evidence of an agreement to rebut the presumption that Island owned the copyrights in the Sound Recordings from the outset.  Accordingly, UMG, as Island's successor-in-interest, is the statutory author and owner of the initial and renewal term copyrights in the Sound Recordings.[19]

---

parties).  Under New York law, extrinsic evidence about the meaning of a contract is inadmissible where a court finds, as here, that the language of the contract is unambiguous.  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 917 (2d Cir. 2010) (New York law).  Under California law, however, "even if the trial court personally finds the document not to be ambiguous, it should preliminarily consider all credible evidence to ascertain the intent of the parties."  Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., 531 F.3d 767, 787 (9th Cir. 2008) (citation omitted) (California law).  "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step -- interpreting the contract."  Id. at 787-88 (citation omitted).  In this case, even when the extrinsic evidence propounded by the Plaintiffs is considered, the 1972, 1974, and 1975 Agreements are not "reasonably susceptible" to the meaning that the Plaintiffs ascribe to them.  Thus, the conclusion that the Sound Recordings are works for hire is the same regardless of whether California or New York law applies.

[19] UMG also argues that Plaintiffs' copyright claim is barred by the three-year statute of limitations and by the doctrine of equitable estoppel.  Because this Opinion concludes that the Sound Recordings were works made for hire, there is no need to address UMG's additional arguments.  In addition, because Plaintiffs' copyright claim fails, UMG's counterclaims for breach of contract and indemnification, which are predicated on a breach by Fifty-Six Hope Road of its representations

3.   Royalties for Digital Downloads

Plaintiffs have moved for summary judgment on their royalty accounting claims concerning digital downloads.  Plaintiffs argue that Paragraph 11 of the Royalty Schedule to the 1992 Royalties Agreement governs royalties paid on digital downloads. Paragraph 11 states:

> In the event that Island sells or licenses third parties to exploit <u>Masters</u> via <u>telephone satellite cable or other direct transmission to the consumer over wire or through the air</u>, Island will credit to your royalty account sixty percent (60%) of its receipts therefrom attributable to the Masters or any of them.

(Emphasis added.)  Plaintiffs also contend that UMG improperly pays royalties based on its <u>net</u>, rather than <u>gross</u>, receipts from digital downloads.

UMG argues that Paragraph 11 does not apply to royalties on digital downloads, which it contends are instead governed by Paragraph 2(c) of the 1992 Royalties Agreement.  By its terms, Paragraph 2(c) governs "the royalty rates and methods of royalty calculations for <u>records</u> released in <u>formats newly developed as a result of advanced technology</u>."  (Emphasis added.)  Among other things, UMG contends that the use of the term "records" in Paragraph 2(c) includes copies of sound recordings embodied in

---

concerning Island's "absolute ownership" of and "perpetual right" to exploit the Sound Recordings in the Marley Recording Agreements, are moot.  UMG's motion for summary judgment on its counterclaims is therefore denied.

all formats, including those developed subsequent to the 1992
Royalties Agreement, such as permanent digital downloads.  By
contrast, Paragraph 11 uses the term "Masters," which is defined
as "master recordings," and is therefore distinct from the term
"records."  In addition, UMG argues that Paragraph 11 deals with
direct "transmission" of "Masters" to consumers, for instance
through satellite or cable broadcasts, rather than digital sales
of "records" to consumers.  UMG thus interprets Paragraph 11 to
apply to situations where UMG sells or licenses the right to
third parties to transmit broadcasts of Bob Marley masters via
satellite, cable or similar means.[20]

UMG has shown that the pertinent language in the 1992
Royalties Agreement is susceptible of at least two fairly
reasonable meanings.  Thus, it is ambiguous whether royalties
for digital downloads are governed by Paragraph 2(c) of the 1992
Royalties Agreement or by Paragraph 11 of the Royalty Schedule.
Even if the extrinsic evidence offered by the Plaintiffs of the
parties' intent is considered, it does not resolve this

---

[20] From the advent of digital music sales until August 2007, UMG
paid royalties for the sale of digital downloads of the Sound
Recordings based on Paragraph 2(c).  In August 2007, UMG began
paying royalties on digital downloads based on Paragraph 11 of
the Royalty Schedule.  In an August 15, 2007 letter to
Plaintiffs' counsel, however, UMG expressly noted that its
decision was "being done solely in the interests of maintaining
a positive working relationship" and that UMG "shall not be
deemed to waive or limit any of [UMG's] rights, remedies,
defenses and/or causes of action."

ambiguity. Accordingly, Plaintiffs' motion for summary judgment on the royalty accounting claims concerning digital downloads is denied.[21]

CONCLUSION

Plaintiffs' May 7, 2010 motion for partial summary judgment is denied. UMG's May 7, 2010 motion for partial summary judgment is granted in part. Plaintiffs' claim for a declaratory judgment that they own the renewal term copyrights in the Sound Recordings is dismissed. The Court reserves decision on that portion of UMG's motion that seeks partial summary judgment on Plaintiffs' royalty accounting claims based on the incontestability provisions in the Marley Recording Agreements. UMG's June 25, 2010 motion to strike is denied as moot. The conduct of further proceedings in this action shall be governed by the scheduling order issued separately with this Opinion.

SO ORDERED:

Dated:   New York, New York
         September 10, 2010

                                    _____
                                            DENISE COTE
                                    United States District Judge

_____

[21] Because it is ambiguous whether Paragraph 11 applies to digital downloads, it is unnecessary for this Opinion to address Plaintiffs' argument that UMG improperly pays royalties on its net, rather than gross, receipts for digital downloads.